IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 10-cr-30074-MJR |
| | ) | |
| ISAAC J. WINDOM, | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM AND ORDER</u>

REAGAN, District Judge:

A.   <u>Introduction</u>

Before the Court is an August 2010 suppression motion – thoroughly briefed and persuasively argued by counsel – involving the admissibility of a firearm discovered during a vehicle search and a statement made to officers following that discovery.  Having conducted a suppression hearing, heard the testimony, and carefully reviewed the evidence, the undersigned Judge finds that an illegal seizure occurred and, although the law enforcement officers were well-intentioned, their conduct was sufficiently deliberate and culpable that suppression is warranted.

B.   <u>Procedural Overview and Factual Summary</u>

An April 2010 one-count indictment charges Isaac Windom with being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1).  Windom was arraigned before Magistrate Judge Donald Wilkerson and released on bond pending trial, which is set to commence on January 10, 2011.

On August 3, 2010, Windom moved to suppress "all evidence obtained as a result of the illegal seizure on January 4, 2010" (Doc. 19, p. 1). Drawing the facts from the testimony and exhibits introduced at the evidentiary hearing on October 7, 2010, the Court summarizes the events of January 4th.

On that day, Illinois State Police Officer Scott Boothe was working as part of the "WAVE" (Working Against Violent Elements) task force[1] patrolling in Washington Park, Illinois.  Around 5:15 pm, Boothe was patrolling in the 5600 block of Warren Street.   Extensive evidence was submitted to demonstrate, and indeed it is undisputed, that this is an area plagued by crime.

Boothe's police vehicle was a Black Chevy Tahoe, equipped with interior emergency red and blue flashing lights.  In Boothe's vehicle that night were four law enforcement officers: (1) Scott Boothe driving the Tahoe; (2) Chris Lutz, a Monroe County, Illinois Sheriff's Deputy assigned to the Metropolitan Enforcement Group of Southern Illinois ("MEGSI"), sitting in the front passenger seat of the Tahoe; and (3) F.B.I. Agent John Kelly and (4) F.B.I. Agent Brian Yingling, both riding in the back seat of the Tahoe. All four officers wore clothing identifying them as police officers, and the Tahoe (though unmarked) was known to local residents as a police vehicle.

---

[1]     WAVE is a collaboration of law enforcement officers from the Illinois State Police, MEGSI, the St. Clair County (Illinois) Sheriff's Department, the East St. Louis Police Department, the F.B.I., the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the U.S. Marshals Service.

When Boothe turned the corner on Warren Street, he saw a white Ford Crown Victoria parked in front of an abandoned house at 5613 Warren. The car had its headlights off, and the engine was idling.  The latter fact could be determined because the car exhaust was visible in the chilly evening air. Boothe immediately activated the police lights on his Tahoe, pulled up, and parked at an angle directly in front of Windom's idling Crown Victoria. According to Agent Lutz, Boothe parked the Tahoe (angled toward the curb, facing east) with his front bumper 8 to 10 feet from the front bumper of Windom's car (which was facing west), positioning the Tahoe so that Windom could not pull straight away (i.e., the Tahoe at least partially blocked Windom's path).

Several significant details merit mention here.  Prior to activating the emergency lights and pulling in front of Windom's car that night, the officers:  (a) had no reports or complaints regarding suspicious persons or activity in the area; (b) had no information that a white Crown Victoria was involved in any criminal activity; (c) had no reports or anonymous calls regarding a crime at 5613 Warren; (d) had no idea who the driver of the Crown Vic was; and (e) had no idea how long he had been parked in that spot.  No traffic offense was being committed, and sitting in a running car parked by the side of the road is not illegal.  All Officer Boothe knew *at this point* was that an African-American male was sitting in an idling car with his headlights off in front of an abandoned house in a high-crime area of Washington Park, Illinois.

*After* the lights were activated and *after* the Tahoe was parked, as two of the officers made their way to the idling Crown Victoria, Officer Boothe saw the driver (later identified as Windom) "moving around in the front seat" seemingly "determined to put something down."  Boothe's  impression was that the driver probably had a "bag of weed" he was trying to hide.

Boothe and Lutz exited the Tahoe and approached Windom's vehicle; the FBI agents remained in the Tahoe at this time.  Boothe walked up to the driver's side of Windom's car while Lutz walked around to the passenger side of Windom's vehicle.

Boothe asked Windom for his driver's license, and Windom politely complied, producing identification.  At this point, Agent Lutz (who, from his position, had a view of the Crown Victoria's ignition) indicated to Officer Boothe that the ignition had been popped or "punched," and a screwdriver was lying on the front seat.

Boothe directed Lutz to step out of the vehicle,[2] based on a concern that the car was stolen (due to the condition of the steering column/ignition). Windom did so, remaining cordial and compliant.  Once he was out of the vehicle and asked about the ignition, Windom explained that he purchased the

---

[2]     Lutz's report (Doc. 24-7) suggests a different chronology of events, i.e., Boothe asked Windom to step out of the car and produce his driver's license *before* Lutz saw the popped ignition or screwdriver.  But Boothe testified at the hearing that, to his best recollection, he asked Windom to exit the car *after* learning about the ignition.

car in that condition and used the screwdriver to start the car.[3]  Windom was respectful and responsive throughout the exchange with officers.

After querying Windom regarding the ignition, Officer Boothe asked Windom if he had any drugs or guns on his person or in his vehicle.  Windom said no.  Officer Boothe asked if Windom would mind consenting to a search of his vehicle. Windom agreed to the search.

After Windom consented to the search, Boothe "felt very at ease with Mr. Windom," who was polite, maintained good eye contact, and gave no indication he "was thinking about running."  In fact, Boothe felt so comfortable that he turned and walked to his vehicle while Agent Lutz searched the Crown Vic.

As he sat in his patrol vehicle running the license and registration check, Boothe looked up and saw Agent Lutz placing Windom in handcuffs.  Lutz walked over to the Tahoe and advised Boothe that Lutz had found a .25-caliber Beretta in the passenger compartment of Windom's car.  Boothe obtained a box from his Tahoe in which to secure the firearm.  The agents finished searching the Crown Victoria, read Windom his *Miranda* rights, and then conducted an on-scene interview of Windom in their vehicle.  Boothe's impression from the interview was that Windom had forgotten the firearm was in the vehicle.

---

[3]     A records check subsequently confirmed that Windom owned the car, and the license plates were registered in his name.

During this questioning, Windom told the officers that he bought the gun from a "crackhead on the street" for $30 and that although the seller had test-fired it to prove that the gun worked, Windom himself had never fired it or cleaned it.  Windom told the officers he did not remember leaving it in the car, but he worked a 24-hour "on call" job and was quite tired.  He also referenced the fact he would rather be caught with the gun than without it.

When asked why he was parked on Warren with his engine running and lights off, Windom said he was using his cell phone to make a call.  He offered that he used to live nearby (just down the street), and he sometimes parks on Warren, drinks beer, and talks to his girlfriend on the phone.[4]

In moving to suppress, Windom claims that his initial detention was illegal, thus his consent to search the vehicle was tainted, and the evidence discovered both *during* the search (the Beretta) and *after* the search (the "confession") must be excluded.  The Government counters that no Fourth Amendment violation occurred, because the officers lawfully approached Boothe's vehicle, Boothe consented to the car search, and no seizure occurred until after the agents secured Windom's consent to search the car and found the gun.

---

[4]    One of the photographs admitted into evidence at the suppression hearing (Government Exhibit 5, taken just after the search of the Crown Victoria) plainly shows a brown paper sack containing what appears to be a beer bottle sitting on top of Windom's car.

C.   ANALYSIS

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment "guarantees the privacy, dignity, and security of persons against arbitrary and invasive acts by officers of the Government." *City of Ontario, California v. Quon*, – U.S. –, 130 S. Ct. 2619, 2627 (2010). Put simply, the Fourth Amendment "requires searches and seizures to be reasonable." *United States v. Jennings,* 544 F.3d 815, 818 (7th Cir. 2008), *citing Illinois v. McArthur*, 531 U.S. 326, 330 (2001).

"Any Fourth Amendment inquiry necessarily begins with a determination of whether a search or seizure actually occurred." *Carlson v. Bukovic*, – F.3d –, 2010 WL 3432218 (7th Cir. Sept. 2, 2010)*, citing Scott v. Harris*, 550 U.S. 372, 381 (2007). The traditional approach to deciding whether a seizure occurred is to ask whether the individual believed he was "free to leave" – an objective standard. *Carlson at *6, citing United States v. Jerez*, 108 F.3d 684, 590 (7th Cir. 1997), and *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

Pertinent to the case at bar is the line separating a wholly consensual encounter between a police officer and an individual (such as when an officer merely approaches a person in a public place and asks if he is willing

to answer a few questions, *see Bostick*, **501 U.S. at 434**) from an encounter in which the officer in some way restrains the liberty of the citizen (resulting in a seizure).  An entirely consensual exchange between a law enforcement officer and a private citizen does not trigger the Fourth Amendment at all.  ***United States v. Hendricks*, 319 F.3d 993, 999-1000 (7th Cir. 2003).**  But a consensual encounter "becomes a seizure when a reasonable person in those circumstances would not feel free to leave." ***United States v. Clements,* 522 F.3d 790, 794 (7th Cir. 2008), *quoting Brendlin v. California*, 551 U.S. 249, 254 (2007).**

As the United States Court of Appeals for the Seventh Circuit declared earlier this year:

> An officer executes a Fourth Amendment seizure when "by means of physical force or show of authority, [he] in some way restrain[s] the liberty of a citizen." *Shell v. United States*, 448 F.3d 951, 955 (7th Cir. 2006).... The test for assessing whether a seizure for Fourth Amendment purposes has occurred is whether "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)....

***Gentry v. Sevier*, 597 F.3d 838, 844-45 (7th Cir. 2010).  *Accord United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993)(a person has been seized within the meaning of the Fourth Amendment if, given all the circumstances, he would *not* have believed himself free to go).**

A law enforcement officer can execute an investigatory stop,

consistent with ***Terry v. Ohio*, 392 U.S. 1 (1968)**, if he has reasonable suspicion that a crime may be afoot.  ***Gentry*, 597 F.3d at 845, *quoting United States v. Hampton*, 585 F.3d 1033, 1038 (7th Cir. 2009), and *Terry*, 392 U.S. at 30.**  But for the investigatory stop to be lawful, the officer "must be aware of specific and articulable facts giving rise to a reasonable suspicion that there may be criminal activity occurring." ***Jewett v. Anders*, 521 F.3d 818, 823-25 (7th Cir. 2009).**

In our case, the parties disagree as to whether Windom was seized, when the seizure occurred, and whether the seizure comported with constitutional requirements.  In its brief opposing suppression, the Government suggests that no seizure occurred at all but alternatively (and more vigorously) argues that a seizure occurred which did not violate Windom's rights, because the seizure "occurred only after the agents saw the jimmied ignition switch, got Windom's consent to search the vehicle, and found the gun"  (Doc. 24, p. 8).

So the Government (relying on ***Clements***) urges the undersigned Judge to hold that "no *Terry* stop occurred here," but <u>if</u> the Court concludes that a *Terry* stop did take place to find the stop "reasonable under the circumstances" (Doc. 24, p. 12).   The latter argument was pressed at the hearing.   Specifically, the Government asserts that <u>reasonable suspicion supported a *Terry* stop</u>, because: "this was a high-crime area; the car was idling in front of an abandoned house; [and] abandoned houses in the area are known as places where illegal drug and gun activity occurs" (Doc. 24, p. 8).

First, the record reveals that Windom was seized within the meaning of the Fourth Amendment.  That conclusion is not altered in any way by the fact he was parked in a running car, as opposed to being pulled over by the police while driving down the road.  Windom's freedom of movement was restrained by the officers' show of authority "through means intentionally applied." ***Brendlin*, 551 U.S. at 254.**   A seizure occurred.

Next, the Court must decide when the seizure took place.  Borrowing from the test first articulated by Justice Stewart in ***United States v. Mendenhall*, 446 U.S. 544, 554 (1980)**, we look to the moment in time when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believe that he was not free to leave."  The inescapable conclusion here is that a reasonable person in Windom's position – who saw a police car pull up with lights flashing and park in front of his vehicle, effectively blocking the path before him, and immediately saw two officers in police attire hastening to either side of his vehicle – would *not* have believed that he was free to leave at that point.

The Illinois Rules of the Road do not permit motorists to disregard police lights or emergency vehicles.  ***See* 625 ILCS 5/11-907.**  And the testimony at the suppression hearing from both Agent Lutz and Officer Boothe confirmed that if Windom *had* attempted to drive off at that point, they would have attempted to stop him.  In fact, Officer Boothe candidly stated that he

likely would have pulled a firearm on Windom, if needed to effect a stop.

When the Tahoe (lights ablaze) zipped up and parked in front of Windom's car (with the law enforcement vehicle parked at an angle facing Windom's car on the "wrong side of the street," partially blocking the street) and two officers hopped out and approached Windom's vehicle, a reasonable person in Windom's shoes would *not* have felt free to ignore the officers, drive off, "decline the officers' requests or otherwise terminate the encounter." ***Bostick*, 501 U.S. at 435-36; *United States v. Drayton*, 536 U.S. 194, 202 (2002).**

Officer Boothe characterized the encounter as an investigative stop, and the Government devoted the lion's share of its argument to this theory. As noted above, such stops are permissible if founded on reasonable suspicion of criminal activity.  As the United States Supreme Court reiterated in ***Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000),** a police officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  While reasonable suspicion is a "less demanding standard than probable cause," the Fourth Amendment requires "at least a minimal level of objective justification," and the "officer must be able to articulate" specific facts that reveal more than a general suspicion or a "hunch" that a crime is occurring or about to occur. ***Id.***

In assessing whether an officer had reasonable suspicion for an

investigatory stop, the district court should consider "the totality of the circumstances" and make common-sense "judgments and inferences about human behavior." *United States v. Oglesby*, **597 F.3d 891, 894 (7th Cir. 2010),** *quoting United States v. Baskin*, **401 F.3d 788, 791 (7th Cir. 2005).** It is important to note that the officer's action must be justified *at its inception*. *Jewett,* **521 U.S. at 824.**

Officers may rely on their experience and training in evaluating the significance of the suspect's conduct. *United States v. Carlisle*, **614 F.3d 750, 755 (7th Cir. 2010),** *citing Baskin*, **401 F.3d at 791;** *Oglesby*, **597 F.3d at 894.** *Accord United States v. Odum*, **72 F.3d 1279, 1284 (7th Cir. 1995).** Additionally, a suspect's nervous or evasive behavior is a pertinent factor to the reasonable suspicion inquiry. *See Cady v. Sheahan*, **467 F.3d 1057, 1061-62 (7th Cir. 2006),** *cert. denied*, **551 U.S. 1119 (2007).**

An officer also may consider the characteristics of the location when sizing up the situation. *Oglesby*, **597 F.3d at 894,** *citing Wardlow*, **528 U.S. at 124;** *United States v. Brewer*, **561 F.3d 676, 679 (7th Cir. 2009).** In other words, presence in a high-crime location is one relevant circumstance. *United States v. Jackson*, **300 F.3d 740, 746 (7th Cir. 2002).** Clearly, though, an individual's presence in a high-crime area cannot, in and of itself, support a particularized suspicion that a subject is committing a crime. *Oglesby*, **597 F.3d at 894,** *citing Wardlow*, **528 U.S. at 124.**

And it is on this point in the case at bar that the prosecution's argument founders.  In its memorandum opposing suppression and in the evidence adduced at the hearing, Government counsel emphasized the heightened level of crime in the village of Washington Park, Illinois.  A sizeable portion of the memo (and the testimony from David Clark, Washington Park's Chief of Police) focused on the crime rate in this small, fiscally-strapped, low-income community.  Some of the facts highlighted by the prosecution, such as the April 2010 murder of the Mayor of Washington Park and the June 2010 shooting at the home of his successor, took place *after* the January 2010 incident at issue here and, thus, were not known to officers at the time they observed Windom's idling Crown Victoria.  However, it is undisputed that Washington Park is rife with gang and narcotics problems and a surplus of abandoned houses which are targeted by copper thieves and used by drug dealers.  Washington Park, Illinois, without doubt, is a high-crime area.

However, Supreme Court and Seventh Circuit caselaw instruct that an individual's presence in a high-crime area does not, by itself, create a particularized suspicion of criminal activity supporting an investigatory stop. ***See Oglesby***, **597 F.3d at 894;** ***Wardlow***, **528 U.S. at 124;** ***Baskin***, **401 F.3d at 791-92.**  So the critical question here is *what else supported the officers' actions before the seizure on January 4, 2010*?

The Government maintains (Doc. 24, p. 9): "we have more than

mere presence in a high crime area – we have the defendant, sitting in the driver's seat of a car idling in front of an abandoned house for no apparent reason, and we have abandoned houses in the area serving as opportune places for illegal drug and gun crime to occur."   The undersigned Judge finds this insufficient to constitute the requisite reasonable suspicion of criminality, "supported by articulable facts" known to the officer *at the time of the stop* or exchange.  ***Baskin*, 401 F.3d at 791, *citing United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000).**

In the case at bar, at the time of the seizure, the officers had no report of suspicious activity or crime in the area of 5600 Warren.  The police had received no anonymous call with concerns about a Crown Victoria.  The officers had observed no traffic infraction or other violation by the driver of the vehicle.  They simply turned a corner and saw an idling car parked in front of an abandoned house at 5:15 pm. The officers could see that the driver was African-American, but they conceded in their testimony that there was nothing out of place or suspicious about a black man being present on Warren Avenue in Washington Park.  They had no idea how long the car had been at that location; for all they knew, the driver had just pulled the car over before they arrived.

Officer Boothe, the driver of the Tahoe (it was his assigned patrol vehicle), shouldered primary responsibility among the officers in the vehicle

that night.  He alone made the decision to pull over, park in front of the Crown Victoria, and approach Windom. When pointedly asked on cross-examination whether it was fair to say that his decision to pull over and investigate the white Crown Victoria parked in front of 5613 Warren "was *not* based on any specific information that you had," Officer Boothe acknowledged:  "That's correct.  It was just past knowledge."

Boothe's experience with and knowledge of the abandoned houses and crime problems in Washington Park is relevant, but it is akin to a hunch that something criminal might be occurring involving the Crown Victoria. Lacking here were specific and articulable facts indicating that Windom was committing (had committed, or was about to commit) a crime, warranting the limited intrusion permitted via *Terry* stop.  ***See Baskin*, 401 F.3d at 791.**

Officer Boothe did recall seeing a gesture by Windom, described as reaching around possibly to hide something like "a bag of weed," but that happened *after* Boothe activated the lights, parked to block Windom's exit, and was already walking up to Boothe's window.  That observation came post-seizure.[5]

While questioning the compliant non-threatening Windom (who maintained eye contact and exhibited no evasive or nervous behavior), Boothe

---

[5]     Morevoer, Boothe did not claim to have relied on that gesture, and he never suggested that it alarmed him.  Indeed, as noted above, Boothe turned away from Windom and returned to the Tahoe without any fear or concern engendered by the gesture.

learned about the punched ignition and the screwdriver on the front seat.   But, like the gesture, those observations occurred just *after* the seizure and cannot be factored in when deciding whether the officers had reasonable suspicion to support the seizure in the first place – i.e., whether the officers' decision was justified at its inception.

Certain key facts of this case parallel the facts noted by the Seventh Circuit eight months ago in ***Gentry***.   In ***Gentry,*** police officers had received a report of a suspicious black male wearing dark clothing, pushing a wheelbarrow through a residential neighborhood of Indianapolis at 2:30 a.m.  Responding to that report, they came upon Kenneth Gentry trotting down the street with a wheelbarrow full of items partially covered by a yellow raincoat.  The officers pulled up in their patrol car *without* activating their emergency lights.  Gentry began waving to them. One officer exited the car and asked Gentry to keep his hands up; the other officer patted Gentry down and felt what turned out to be a garage door opener.  Asked what he was doing, Gentry said he was headed home.  Activation of the garage door opener and a search of the wheelbarrow ultimately revealed that certain items contained therein had been stolen from a garage nearby, and Gentry was charged with burglary and theft.

In scrutinizing Gentry's encounter with the police officers, the Seventh Circuit held that a seizure had occurred "[w]hen the officers pulled up in their patrol car and one officer exited the car and told Gentry to 'keep his

hands up,'" because at that point a reasonable person "would not believe that he was free to leave." **Gentry, 597 F.3d at 844**.

The seizure resulted *immediately* after the officer in question arrived at the scene, and the seizure was <u>not</u> an investigatory stop consistent with *Terry*, because:

> The officer who initially approached Gentry lacked any articulable facts at that point to justify a *Terry* stop. The officer was acting solely upon a general report of a "suspicious person," ... which did not provide any articulable facts that would suggest the person was committing a crime or was armed....
>
> [T]he officer who initially approached Gentry was not provided with sufficient information in the police dispatch to warrant a *Terry* stop....
>
> The undisputed record also makes clear that Gentry himself did not give the officers a reason to suspect that he had been engaged in any wrongdoing.

**Gentry, 597 F.3d at 845-46, *citing United States v. Packer*, 15 F.3d 654 (7th Cir. 1994).**

Like the officers in **Gentry** and **Packer**, prior to the seizure the officers in the case *sub judice* had "no articulable facts that would suggest the person was committing a crime or was armed."  **Id.**  Like the suspect in **Gentry**, Windom did not attempt to flee, did not exhibit any evasive behavior, did not appear to pose a threat to the officers, and gave the officers no reason to suspect that he had engaged in any wrongdoing.  Shortly after the seizure, the officers saw the punched ignition in Windom's car, which obviously could

indicate that the vehicle was stolen.  But post-seizure observations cannot supply the reasonable suspicion needed to justify the seizure in the first instance.

As the Seventh Circuit declared in *Gentry*, **597 F.3d at 848,** nothing about the suspect's demeanor or actions indicated that he was engaged in criminal activity or presented a threat, and "[a]lthough the officers ultimately uncovered Gentry's burglary and theft, such discoveries cannot be used in retrospect to justify the initial search."  By the same logic, the post-seizure discovery of the punched ignition and screwdriver cannot be factored in when assessing whether reasonable suspicion supported the seizure at its inception.

The undersigned Judge in no way downplays the dangers that the officers on the WAVE detail confront in patrolling the Village of Washington Park.  Indeed, the weapon stuffed between the seat cushions in Windom's car was loaded with the hammer cocked and a round in the chamber.  The Seventh Circuit repeatedly has recognized the demanding work of law enforcement officers who must make split-second decisions in less than ideal circumstances.

For instance, in **Packer, 15 F.3d at 658,** officers had responded to a citizen's call of a suspicious vehicle parked on a Milwaukee street at 1:00 a.m.  The Court of Appeals acknowledged the reality of the "mean streets that police officers face every day in their struggle with the criminal element of our society" and lauded the police officers' willingness to "regularly risk their

lives in the interests of public safety." ***Id.***

The Court summarized several cases involving investigatory stops, remarking: "In cases where *Terry* stops were found to be justified by reasonable suspicion, the law enforcement officer generally has observed or has received a report of more suspicious activities than four men sitting together in a parked car at the wee hours of the morning," and "in the instant case, the officers were not aware of any specific crime being committed in the area." Based on this conclusion, the Seventh Circuit held:

> In order to protect the constitutionally guaranteed rights of us all, the minimum threshold of "specific and articulable facts" sufficient to give rise to reasonable suspicion must be higher, albeit marginally, than those presented here. The Government must justify its intrusions according to the Fourth Amendment....
>
> Therefore, because the officers' investigatory stop was **not fully justified by a reasonable and articulable suspicion as required by *Terry***, the evidence seized during the encounter should have been suppressed by the district court.

***Packer***, 15 F.3d at 659 (emphasis supplied).

This Court similarly concludes that the facts needed to justify this seizure fall just short. Considering all the circumstances known to the officers *at the time of the encounter* (including Officer Boothe's experience, the time of day, the abandoned house, the idling car, and the high-crime location, etc.), the undersigned Judge finds that the officers lacked a "reasonable suspicion based on articulable facts that a crime [was] about to be or [had] been committed."

***Carlisle*, 614 F.3d at 754.**

    D.   <u>CONCLUSION</u>

The Fourth Amendment prevents police from seizing a person without a reasonable suspicion of criminal activity. No *specific* and articulable facts known to the officers *at the time of their initial encounter* with Windom furnished reasonable suspicion that he had committed a crime or was about to commit a crime. Accordingly, the seizure runs afoul of the Fourth Amendment. Although counsel did not address this in their briefs or arguments, one last point must be discussed.

As Chief Justice Roberts reminded last year, the Fourth Amendment does not expressly preclude the use of evidence obtained in violation of its commands, and the fact a Fourth Amendment violation occurred does not necessarily mean that the evidence must be excluded. ***Herring v. United States*, – U.S. –, 129 S. Ct. 695, 699 (2009).** But, subject to clearly defined exceptions delineated in Supreme Court precedent (e.g., "good faith" objectively reasonable reliance on a subsequently invalidated search warrant, ***see United States v. Leon,* 468 U.S. 897 (1984)**), the exclusionary rule "forbids the use of improperly obtained evidence at trial." ***Herring,* 129 S. Ct. at 699-700.** As Justice Roberts explained, this judicially created rule applies where the police conduct was "sufficiently deliberate that exclusion can meaningfully deter it," and the deterrence "is worth the price paid by the justice

system." *Id.* **at 702.**

Mindful that exclusion is *not* a "necessary component of a Fourth Amendment violation," **Herring, 129 S. Ct. at 700,** and having carefully examined the officers' conduct and weighed the benefits of deterrence against the costs of exclusion, the undersigned Judge concludes that the evidence here must be excluded.

For all these reasons, the Court **GRANTS** Defendant Windom's motion (Doc. 19) and **SUPPRESSES** the firearm retrieved in the search of the vehicle plus Windom's statement to officers following that discovery.

IT IS SO ORDERED.

DATED October 28, 2010.

s/ **Michael J. Reagan**
Michael J. Reagan
United States District Judge